UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| **REBECCA RUDICEL,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **CAUSE NO. 1:06-CV-00361** |
| ) | |
| **MICHAEL J. ASTRUE,**[1] ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Rebecca Rudicel appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[2] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Rudicel applied for DIB on May 19, 2003, alleging that she became disabled as of September 27, 2002, due to a back impairment. (Tr. 31, 45-47, 51.) The Commissioner denied her application initially and upon reconsideration, and Rudicel requested an administrative hearing. (Tr. 31-32, 35-37, 40-44.) On October 5, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Rudicel, who was represented by counsel, Rudicel's husband, and a vocational expert ("VE") testified. (Tr. 366-99.) On March 4, 2005,

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and thus he is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

the ALJ rendered an unfavorable decision to Rudicel. (Tr. 292-303.)  Rudicel submitted a timely request for review to the Appeals Council, who vacated the decision and remanded the case for further proceedings. (Tr. 305-08.)

On remand, the ALJ held a supplemental hearing during which Rudicel, who was represented by counsel, Rudicel's husband, and another VE testified. (Tr. 400-31.)  On February 1, 2006, the ALJ issued a second unfavorable decision to Rudicel, concluding that she was not disabled despite the limitations caused by her impairments because she could perform a significant number of jobs in the national economy. (Tr. 13-24.)  The Appeals Council denied Rudicel's request for review, making the ALJ's second decision the final decision of the Commissioner. (Tr. 4-7.)  Rudicel filed a complaint with this Court on November 6, 2006, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II.  FACTUAL BACKGROUND[3]

### *A.  Background*

At the time of the ALJ's decision, Rudicel was fifty-three years old, had a high school education, and possessed work experience as a kitchen food assembler and diet clerk. (Tr. 45, 67, 334.)  Rudicel stated that she stopped working on September 30, 2002, explaining in her DIB application that she became disabled as of that date because of a "back (spine) problem due to scoliosis/back fusion." (Tr. 51.)

At the hearing, Rudicel testified that she could bathe and dress herself independently, though she confided that she cannot reach across her back to fasten a zipper and that her husband

---

[3] The administrative record in this case is voluminous (431 pages), and the parties' disputes involve only small portions of it, that is, the decision by the ALJ to discount the severe limitations proffered by Rudicel's treating specialist, Dr. Rahn.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

2

sometimes has to help her with her shoes and with her hair. (Tr. 385; *see also* Tr. 389-90, 392.) She stated that she performs "[v]ery little" household work, though she reported she does do "eye-level dusting" and performs basic meal preparation. (Tr. 385; *see also* Tr. 389.)  Rudicel explained that she depends on her husband to retrieve items from high or low cabinets and to lift food in and out of the oven. (Tr. 379; *see also* Tr. 390-91.)  She stated that she can no longer do laundry, vacuum, or grocery shop. (Tr. 379.)  She reported that she drives a car about once a week but that she has difficulty with turning to look behind her. (Tr. 385; *see also* Tr. 391-92.)  Her leisure activities include eating out, going to the mall, and sewing. (Tr. 385.)  She also reported that she and her husband drove to Florida last year for the winter months. (Tr. 386.)

As to Rudicel's physical status, she explained that she can lift no more than three pounds and that she can stand for "about 20 to 30 minutes" but then must sit for "about [a] half hour." (Tr. 408, 410-11.)  She clarified that if she can alternate between sitting and standing that the pain is "not as punctuated." (Tr. 408, 410.)  She further reported that standing is harder for her than walking, as her pain decreases when she "can move a little bit." (Tr. 409.)

When asked to describe her pain, Rudicel explained that it feels like "a lot of pressure" in the middle of her back extending to the right side and that when she stands an "aching" pain goes down her right leg. (Tr. 411.)  She reported that she has trouble sleeping through the night due to her pain. (Tr. 384, 412; *see also* Tr. 393.)  Rudicel also testified that the "[p]ain definitely affects [her] concentration." (Tr. 415, 418; *see also* Tr. 423-24, 426-27.)  More specifically, she stated: "[W]ith the medications and the pain, I just, I can't concentrate at all." (Tr. 415.)  She explained that she can no longer manage their checkbook, stating that she "used to be a perfectionist." (Tr. 416.)

3

To obtain relief from her pain, Rudicel testified that she frequently alternates between lying down and walking, reporting that she lies down for twenty to thirty minutes, three to four times a day. (Tr. 382-83, 413.) She stated that she received one epidural injection, which helped for "a couple of weeks and then the pain was just right back," and that she underwent a short course of physical therapy. (*Id*.) Though Rudicel testified that she has been prescribed medication for her pain, she stated that she does not like to take it because it makes her drowsy and "like [she's] in a daze," causes her eyes not to "focus," or upsets her stomach; instead, she generally relies on over-the-counter medication. (Tr. 383, 417-18.) She did say, however, that in the month preceding the hearing she took Neurontin at night, which "helps some" but also makes her "groggy" in the morning.[4] (Tr. 412.) Despite her complaints of pain, Rudicel emphasized that her surgery was "helpful." (Tr. 413.) She elaborated: "[T]hey said if I hadn't had it done, I would not be walking." (*Id*.)

### B. Summary of the Relevant Medical Evidence

On February 8, 2002, Rudicel visited Dr. Michael Roper, an orthopaedic surgeon. (Tr. 100.) On physical examination, Dr. Roper noted a significant right flank hump, which had marked rotation and which was severely accentuated with bending. (*Id*.) An x-ray showed right-sided thoracal lumbar curve of twenty degrees with severe rotation of about forty-five degrees, together with an eight-degree compensatory cervical thoracic curve. (*Id*.) He prescribed Naprosyn and referred her to Dr. Kevin Rahn, another orthopaedic surgeon. (*Id*.)

On February 26, 2002, Dr. Rahn saw Rudicel, who reported experiencing back and leg

---

[4] Rudicel's husband also testified at the hearings, and his testimony essentially corroborated Rudicel's subjective complaints. (*See* Tr. 389-94, 423-27.)

4

pain for the past year that had progressively worsened during the previous six months. (Tr. 231-33.)  On forward bending, he noted a significant thoracolumbar prominence on the right side, though neurologically she was normal. (*Id*.)  He assigned a diagnosis of thoracolumbar scoliosis, right and referred her for an MRI, which showed significant stenosis moderately present at L3-4, 4-5, as well as some at L2-3, together with spondylosis changes and significant arthritic conditions in her lower lumbar spine. (Tr. 229.)  Dr. Rahn recommended that Rudicel try conservative management and prescribed Celebrex for inflammation, physical therapy for lumbar stabilization, and a body glove for support. (*Id*.)

After six months of conservative intervention and worsening symptoms, Dr. Rahn noted that Rudicel was getting more prominence of her right rib hump and more rotational deformity at the curve. (Tr. 214.)  Rudicel told Dr. Rahn that she was growing increasingly miserable and wanted to take care of the problem surgically in the near future. (*Id*.)  Dr. Rahn advised: "At the very worst, hopefully we would not make her any worse and we would make her the same as what she is now and just stabilize her with in situ fusion." (*Id*.)  Dr. Rahn clarified, however, that he thought he would "get a fair amount of correction without too much difficulty . . . ." (*Id*.)  He planned a posterior fusion and recommended an EBI stimulator and spinal cord monitoring. (*Id*.)

On September 30, 2002, Rudicel underwent a posterolateral fusion, T8 to L4, thoracolumbar scoliosis and posterior instrumentation, T8 to L4. (Tr. 89.)  At her two week follow-up visit, Rudicel reported that she was doing fairly well, that she was well-balanced, and that she had almost no pain; she stated she had taken no pain medication in the past few weeks. (Tr. 200.)  An x-ray showed that her fusion was fairly solid; Dr. Rahn told her to avoid heavy lifting and to continue to wear her back brace. (*Id*.)  At her one-month follow-up visit, Rudicel

stated that she was doing very well with minimal pain or difficulty. (Tr. 197.)  An x-ray showed a solid fusion mass and that the instrumentation was in good position; Dr. Rahn limited Rudicel to lifting less than ten pounds. (*Id.*)

In January 2003, Rudicel again told Dr. Rahn that she was doing very well, as she had only minimal complaints and intermittent back pain. (Tr. 195.)  He limited her to lifting less than fifteen pounds and advised her to stop wearing her back brace. (*Id.*)  In April 2003, Dr. Rahn documented again that Rudicel was doing quite well, stating that she was walking better and that her pain had resolved. (Tr. 189.)  An x-ray showed Rudicel's well-maintained alignment. (*Id.*)  Dr. Rahn noted that Rudicel complained of some stiffness, which was normal following a fusion; thus, he referred her for six weeks of physical therapy. (Tr. 181, 184-86, 189.)  The following month Dr. Rahn imposed permanent restrictions of lifting no more than fifteen pounds, noting that he may reduce this amount in the future "if need be." (Tr. 187.)

In July 2003, Dr. Elpidio Feliciano examined Rudicel at the request of the state agency. (Tr. 143-44.)  Dr. Feliciano documented Rudicel's reduced lumbar and cervical range of motion; symmetrical reflexes; normal sensation; absence of muscle spasms; and a normal ability to walk on her heels and toes, tandem walk, and squat. (*Id.*)  He also noted that she had 3/5 strength in her biceps, 5/5 strength in her shoulders, and 5/5 strength in her legs. (*Id.*)

In August 2003, Dr. Jonathan Sands reviewed the record at the request of the state agency. (Tr. 135-42.)  He concluded that Rudicel could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for at least two hours in an eight-hour day, sit about six hours in an eight-hour day, and perform unlimited pushing and pulling. (*Id.*)  He further opined that Rudicel could occasionally climb, stoop, kneel, crouch, and crawl. (*Id.*)  Dr. Sand's

6

opinion was affirmed by Dr. Bruce Whitley in December 2003. (*Id*.)

At Rudicel's one year follow-up visit in September 2003, Dr. Rahn noted that she was doing fairly well though she still complained of some back pain with standing, walking, and sitting. (Tr. 176-77.) An x-ray showed a solid fixation of the implant and fairly good correction of her scoliosis; he noted that Rudicel was intact neurologically. (*Id*.) Nonetheless, Dr. Rahn then adjusted Rudicel's permanent restrictions to lifting no more than three pounds, no bending or twisting, and no prolonged sitting or standing. (*Id*.) He also ordered an MRI, which showed no significant compression fractures and no evidence of complications. (Tr. 165-66, 172.) Rudicel returned to Dr. Rahn several weeks later, complaining of "a lot of midthoracic type pain"; he thought her pain was being caused more by the instrumentation and fusion. (Tr. 172.) He kept her restrictions the same and recommended that she receive an epidural injection, which she did on October 2, 2003. (Tr. 160, 172.)

Rudicel returned to Dr. Rahn on October 14, 2003, reporting that the epidural helped somewhat but that it did not take away her pain entirely. (Tr. 157-58.) She stated that she continued to have difficulty with prolonged sitting or standing and with any kind of lifting. (*Id*.) Her neurological examination was unchanged. (*Id*.) He recommended that her stimulator be removed, stating that "[i]t is relatively spent and causing some pain as well." (*Id*.) Dr. Rahn then reiterated Rudicel's permanent restrictions of lifting no more than three pounds; no prolonged standing or walking; no waist to shoulder lifting or constant lifting from floor to waist; no bending, twisting, stretching, climbing stairs or ladders, kneeling, or squatting; no frequent driving or driving of heavy equipment or trucks; and that she should change position every twenty to thirty minutes because of her pain. (Tr. 157-58, 255.) He opined: "I think she ha[d] a

7

fairly significant fusion done on her thoracic and lumbar spine and have recommended going this route to protect her fusion and to prevent her from injuring herself at this point." (Tr. 158.)

On November 4, 2003, Dr. Rahn surgically removed Rudicel's stimulator battery, and her follow-up evaluation from that surgery was satisfactory. (Tr. 147.)  He then maintained her current work restrictions and instructed her to return to him as needed. (*Id*.)

In June 2004, Dr. Rahn completed a functional capacities assessment at the request of Rudicel's insurance company. (Tr. 279-80.)  He concluded that in an eight-hour work day Rudicel could stand less than one hour, walk less than two hours, sit less than two hours, and that she had to change positions every twenty minutes. (*Id*.)  He also restricted her to lifting no more than three pounds; only occasional bending or reaching above shoulder level; and no squatting, climbing, crawling, or twisting. (*Id*.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

8

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. §

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On February 1, 2006, the ALJ rendered his opinion. (Tr. 13-25.) He found at step one of the five-step analysis that Rudicel had not engaged in substantial gainful activity since her alleged onset date and at step two that her back impairment was severe. (*Id.*) At step three, he determined that Rudicel's impairment was not severe enough to meet a listing. (*Id.*) Before proceeding to step four, the ALJ determined that Rudicel's testimony of debilitating limitations was "not entirely credible" (Tr. 20) and that she had the following RFC:

> [T]he claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, sit for about six hours in an eight-hour workday, and stand and/or walk for about six hours in an eight-hour workday. She must be able to alternate between sitting and standing at will, but can sit and stand for 30 minutes at a time. She is limited to occasional bending and twisting, and can perform no kneeling, crouching, crawling and squatting job requirements. She cannot climb ladders, ropes and scaffolds, cannot work around unprotected heights or have exposure to dangerous machinery, and cannot drive as a job requirement. She is limited to low stress work, which is defined as occasional changes in the work setting.

(Tr. 19.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Rudicel could not perform her past relevant work. (Tr. 13-25.) Thus, the ALJ proceeded to step five where he determined that Rudicel could perform a significant number of jobs within the national

economy, including a folder, small products assembler, and hand trimmer. (*Id.*)  Therefore, Rudicel's claim for DIB was denied. (*Id.*)

### C. The ALJ Properly Evaluated the Opinion of Dr. Rahn, Rudicel's Treating Orthopaedic Surgeon

Rudicel's sole argument on appeal is that the ALJ improperly evaluated the opinion of Dr. Rahn, her treating orthopaedic surgeon. (Opening Br. at 13-18.)  Contrary to Rudicel's argument, substantial evidence supports the ALJ's consideration of Dr. Rahn's opinion.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).  In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, "[a] claimant is not entitled to DIB simply because his treating physician

11

states that he is 'unable to work' or 'disabled,'" *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p.  In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see also* 20 C.F.R. § 404.1527(e)(3); *Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006).  "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether the individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.  Nonetheless, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.  "In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) . . . ." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.

Here, the ALJ thoroughly considered Dr. Rahn's medical records, including his note assigning Rudicel a permanent lifting restriction of fifteen pounds and his later note that altered that restriction to three pounds and that limited Rudicel to standing for less than one hour, walking for less than two hours, and sitting for less than two hours in an eight-hour work day.  In fact, the ALJ penned six lengthy paragraphs discussing Dr. Rahn's clinical findings and recommended restrictions. (*See* Tr. 20-22.)  Nonetheless, the ALJ ultimately assigned "greatest weight" to the less restrictive limits assigned by the state agency physicians, explaining that they

12

were "better supported by the evidence of record." (Tr. 21); *see generally Dixon*, 270 F.3d at 1177 (acknowledging that a consulting physician's opinion may offer "the advantages of both impartiality and expertise"); *Smith v. Apfel*, 231 F.3d 433, 442-43 (7th Cir. 2000) (emphasizing that a consulting physician may bring expertise and knowledge of similar cases).

More specifically, the ALJ reasoned:

> On the issues of lifting and carrying and maximum standing, walking and sitting, the undersigned gives greatest weight to the opinion of the State agency physicians.  In a residual functional capacity assessment . . . the State agency physicians opined that the claimant can lift 20 pounds occasionally and 10 pounds frequently and can sit for six hours and stand and/or walk for six hours.  This is less restrictive than the limits assessed by Dr. Rahn, but is better supported by the evidence of record.  Initially, Dr. Rahn limited the claimant to lifting 15 pounds, which approximates the limits in the State agency residual functional capacity.  However, just a few months later, Dr. Rahn reduced the maximum lifting to three pounds, even though the record shows no evidence of an injury or a problem with the fusion at that time.  The MRI taken at that time indicated no new problems and no finding that would explain the claimant's symptoms of pain.  Also, no functional capacity evaluation was done.  It appears, then, that Dr. Rahn assessed more restrictive lifting limits based mostly, if not completely, on the claimant's subjective complaints.  Thus, the undersigned gives little weight to this portion of Dr. Rahn's opinions.  As for sitting, standing and walking limits, Dr. Rahn consistently opined that the claimant needs a sit/stand option, but did not introduce any specific limitations on total time that the claimant can sit, stand and walk until he filled out the functional capacities form in June 2004.  In that form, he did not cite any evidence to explain the more severe limitations.  In fact, the record does not indicate that Dr. Rahn had seen the claimant since November 2003.  Thus, this portion of Dr. Rahn's June 2004 opinion is given no weight.
> . . .
> On the issues relating to postural movement and other non-exertional limitations, the undersigned gives great weight to the October 2003 opinion of Dr. Rahn, in which he opined that the claimant needs to change position every 30 minutes and is restricted in the areas of bending, twisting, stretching, climbing, kneeling, squatting, and driving.

(*Id*.)  Clearly, the ALJ thoroughly analyzed Dr. Rahn's opinion and incorporated some of Dr. Rahn's recommended restrictions into the RFC determination; consequently, Rudicel is in essence solely challenging the ALJ's decision not to incorporate *all* of Dr. Rahn's restrictions

13

into her RFC.

In that regard, "a medical source statement must not be equated with the administrative finding known as the RFC assessment." SSR 96-5p.  As stated *supra*, the determination of a claimant's RFC is an issue reserved to the Commissioner, 20 C.F.R. § 404.1527(e), and "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see generally Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").  Thus, contrary to Rudicel's suggestions, the ALJ is under no obligation to afford Dr. Rahn's restrictions a significant amount of weight when rendering his RFC determination.

Moreover, the ALJ carefully considered Dr. Rahn's more severe restrictions, yet properly concluded that they lacked the support of the objective medical evidence of record and were likely based upon Rudicel's subjective complaints. *See White v. Barnhart*, 415 F.3d 654, 658-59 (7th Cir. 2005) (discounting a treating physician's opinion because it was based on the claimant's subjective complaints).  Having found Rudicel's subjective allegations "not entirely credible," a finding which Rudicel does not challenge on appeal, the ALJ then chose to discount Dr. Rahn's proffered restrictions concerning Rudicel's lifting capacity and the total time Rudicel is able to sit, stand, or walk in an eight-hour work day. Thus, the ALJ's rationale concerning his RFC determination is easily traced in this instance. *See Books*, 91 F.3d at 980 ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." (citation and internal quotation marks omitted)).

Nonetheless, Rudicel raises several specific challenges to the ALJ's treatment of Dr. Rahn's opinion.  First, she contends that the ALJ erred by assigning significant weight to the opinion of the state agency physicians over the opinion of Dr. Rahn because the ALJ rejected the opinion of the state agency physicians in his first decision. (*See* Tr. 300.)  More particularly, in his first decision the ALJ discounted the opinion of the state agency physicians because they did not have the opportunity to see or examine Rudicel and did not see all of the medical evidence of record. (*See id.*)  Rudicel thus contends that the ALJ erred by "fail[ng] to explain why these reasons are not so important in his second decision when they were very important in his first decision." (Opening Br. at 15.)

Rudicel's argument, however, is futile, as the Appeals Council vacated the ALJ's March 4, 2005, decision and remanded the case for further proceedings. (Tr. 305-08.)  Thus, the ALJ's first decision never became the final decision of the Commissioner, and therefore it is not subject to judicial review. *See* 20 C.F.R. § 404.981.  Rather, the ALJ was instructed by the Appeals Council to perform additional analysis of the medical source opinions of record, which is exactly what he did; the ALJ was in no way bound by the reasoning in his earlier decision. *See id.*; *Daley v. Callahan*, No. 97 C 1650, 1997 WL 33117944, at *6 (N.D. Ill. Sep. 26, 1997) ("[A]n ALJ's decision . . . does not become final and binding until the Appeals Council issues a decision or denies the request for review.").  Therefore, Rudicel's first argument is utterly unavailing.

In her next argument, Rudicel essentially criticizes the ALJ for concluding that Dr. Rahn's severe restrictions were not supported by the objective medical evidence of record.  More specifically, Rudicel contends that Dr. Rahn did indeed "give a reason supported by medical evidence for reducing the weight limit from 15 pounds to three pounds, and the ALJ did not

15

mention this reason in his decision." (Opening Br. at 15.) Rudicel then points to Dr. Rahn's October 14, 2003, note, which acknowledged that Rudicel had a "fairly significant fusion" and that the limitations were assigned to "protect her fusion and to prevent her from injuring herself." (Tr. 158.)

This statement by Dr. Rahn in October 2003, however, does little to invalidate the ALJ's reasoning.[6] To explain, Rudicel had the same "fairly significant fusion" when Dr. Rahn first assigned her a permanent fifteen-pound lifting restriction, and Dr. Rahn cited no new objective medical evidence, such as an injury, a problem with the fusion, or MRI results, to support the reduction of Rudicel's lifting restriction from fifteen pounds to three pounds. *See* 20 C.F.R. § 404.1527(d)(3) (stating that greater weight is given to a physician's opinion that is supported by objective medical evidence); *Smith*, 231 F.3d at 441; *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999). Thus, the ALJ reasonably concluded that Dr. Rahn's restrictions of October 2003 were based on Rudicel's subjective symptoms, rather than on objective medical evidence, *see Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him), and consequently the ALJ discounted these restrictions proffered by Dr. Rahn. *See White*, 415 F.3d at 658-59. His decision to do so is supported by substantial evidence.

Third, Rudicel contends that the ALJ's reason for discounting Dr. Rahn's June 2004 limitation on the amount of time she can sit, stand, and walk during an eight-hour work day is

---

[6] Moreover, "a written evaluation of each piece of evidence or testimony is not required." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Rather, the ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (internal quotation marks and citation omitted). "A more extensive requirement sacrifices on the altar of perfectionism the claims of other people stuck in the queue." *Stephens*, 766 F.2d at 288.

16

flawed. (Opening Br. at 16-17.)  As set forth *supra*, the ALJ stated: "Dr. Rahn consistently opined that the claimant needs a sit/stand option, but did not introduce any specific limitations on total time that the claimant can sit, stand and walk until he filled out the functional capacities form in June 2004." (Tr. 21.)  Rudicel argues, however, that the ALJ's rejection of this additional limitation "is a distinction without a difference" since Dr. Rahn consistently reported during his treatment that there should be some limitation on her ability to stand and walk. (Opening Br. at 16-17.)

Contrary to Rudicel's perspective, Dr. Rahn's additional limitation concerning the number of hours that Rudicel can stand and walk in an eight-hour workday is a distinction with a significant difference.  To explain, under Dr. Rahn's first set of restrictions, Rudicel could continuously alternate between sitting and standing during an eight-hour work day; in contrast, under his June 2004 restrictions, Dr. Rahn essentially stated that Rudicel must lie down three hours during an eight-hour work day, as he limited her to standing no more than one hour, sitting no more than two hours, and walking no more than two hours. *See* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  The ALJ chose to reject this additional limitation, explaining that Dr. Rahn cited no evidence in his June 2004 opinion to explain this severe restriction and furthermore, that Dr. Rahn had not even seen Rudicel in the seven months preceding his June 2004 opinion. (Tr. 21-22); *see* 20 C.F.R. § 404.1527(d)(2), (3) (instructing an ALJ when assigning a weight to a physician's opinion to consider the frequency of the physician's examinations and the objective medical evidence proffered by the physician in support of his or her opinion).  We will not accept Rudicel's invitation at this juncture to merely substitute our

17

judgment for the Commissioner concerning the weight to apply to Dr. Rahn's additional limitations. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence").

Not to be deterred, Rudicel next argues that the ALJ erred when weighing the factors articulated in 20 C.F.R. § 404.1527(d), contending that "all [factors] favor the opinion of Dr. Rahn." (Opening Br. at 17.) More specifically, Rudicel states that Dr. Rahn's specialty in orthopaedics and his treatment relationship with Rudicel "entitles his opinion to more weight than that of the State agency physicians." (Opening Br. at 17.) Again, the Court will not accept Rudicel's plea to merely re-weigh the evidence from the medical source opinions of record. *Clifford*, 227 F.3d at 869. As stated *supra*, the ALJ explained that he discounted some of Dr. Rahn's severe restrictions because they were not supported by the objective medical evidence, *see* 20 C.F.R. § 404.1527(d)(3), and because Dr. Rahn's June 2004 opinion concerning Rudicel's standing, sitting, and walking limitation was inconsistent with his prior restrictions, *see* 20 C.F.R. § 404.1527(d)(4).

In that same vein, Rudicel also emphasizes that Dr. Rahn's opinion should have received greater weight because he "had a significant amount of evidence . . . that the State agency physicians were simply not aware of." (Opening Br. at 17.) More particularly, she observed that the state agency physicians' review of the record did not include any of Dr. Rahn's notes dated after June 2003. (*Id.*) However, Rudicel provides no legal explanation for why this results in the ALJ's improper reliance on the state agency physicians' opinions. Dr. Rahn's treatment notes only extended through November 2003, and the ALJ concluded that they did not document any

18

objective medical evidence to substantiate the severe restrictions assigned by Dr. Rahn in October 2003. Insofar as the state agency physicians' opinion conflicts with Dr. Rahn's October 2003 opinion, the ALJ is required to weigh conflicting evidence, ultimately deciding which evidence to believe, and this Court does not resolve evidentiary conflicts. *Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (deeming unconvincing the claimant's complaint that the ALJ gave greater weight to an earlier mental examination than to one conducted later and concluding that "[w]eighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do").

Finally, Rudicel argues that "the ALJ did not comply with the requirements of the remand order and the regulatory duty to recontact [Dr. Rahn]." (Opening Br. at 17.) Rudicel's argument, however, mischaracterizes the requirements of the regulations and the Appeals Council's remand order. In its remand order, the Appeals Council stated: "As appropriate, the [ALJ] *may* request the treating source to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairment . . . ." (Tr. 307-08 (emphasis added).) The regulations then explain that the ALJ must recontact a treating physician when the information from that physician is inadequate for the ALJ to determine whether the claimant is disabled. 20 C.F.R. § 404.1512(e); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, the ALJ concluded that the record contained sufficient evidence to determine that Rudicel was not disabled; clearly, the ALJ was not required to recontact Dr. Rahn merely because he did not ultimately adopt all of Dr. Rahn's opinions concerning Rudicel's limitations.

In sum, the ALJ sufficiently evaluated Dr. Rahn's opinion and adequately explained his

rationale for assigning it the weight that he did, allowing this Court to adequately trace his path of reasoning with respect to the assignment of Rudicel's RFC. *See Books*, 91 F.3d at 980. Consequently, Rudicel's argument does not merit a remand of the Commissioner's final decision.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Rudicel.

SO ORDERED.

Enter for this 16th day of August, 2007.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
